We have five cases on the calendar this morning. Three patent cases from the PTAB, a customs case from the CIT, and a case from the Claims Court regarding an employee. The first case is E.I. DuPont and Artra Daniels Midland v. Synvina, 2017-1977. Mr. Fliberg. Thank you, Your Honor. Good morning. May it please the Court. As the chart on page two of our reply brief shows, the only difference between Claim 1 of the 921 patent and RU-177, according to the patent owner. Mr. Fliberg, before we get into those details, while you're standing there, let's address standing. Yes, Your Honor. What's the status of the plant? It opened, Your Honor, on April 30th, and there was a press release. It was post-briefing, so we haven't submitted it. We'd be happy to submit it if you'd like to see it. It was opened on April 30th, and so the plant is in operation right now. Okay. And the processes the plant is performing tracks the statements by the declarants that it matches up with the examples that were disclosed in the joint PCT application? That's correct, Your Honor. As our witnesses testify, this plant is a dedicated plant. It's dedicated to this process. Why isn't it evidence of copying leading to a secondary consideration supporting non-obviousness? Your Honor, the copying, as the Board found, there was no evidence of copying as the case law requires here. There was no evidence of, for example, access to their technology and then using that technology to develop ADM's technology. So the Board found there was no For example, 732 Publication is a DuPont publication, which is one of 2B Prior Art, and so DuPont has been working on this technology for years. And so these companies are involved in a commercial effort to bring this very important green technology to market, and we put in testimony from three witnesses who have direct knowledge of the plant and the process. We have no rebuttal evidence from the other side. They had an undisputed evidence that these are direct competitors in this emerging market for furan-based biopolymers. This is a small emerging market, and I think a key fact is that this plant is dedicated to this process. You don't dispute that you had access to the information describing their process, right? I mean, you had the patent, right? There was a publication, that's true, Your Honor, but there was no evidence of copying of the technology. This work, as the witnesses testified, there was earlier work with the University of Kansas, and there was a continuation of that work. And that 755 Publication talks about a spray technique for a spray oxidation technique, which is somewhat different from what's described in the 921 patent. So there are differences in the way that the oxidation process was carried out. But you're not denying knowledge of the patent? I don't have any information one way or the other about knowledge of the patent. You recall in these PTAB proceedings, there's little or no discovery, and so there's no evidence of any knowledge or intent concerning the patent. The patent owner does have the burden to prove copying at the PTAB, and procedurally there was very little opportunity for discovery there, but there is no evidence of knowledge of the patent. One of the reasons the board didn't find copying is because the plant wasn't operational. Do you agree that to the extent there's anything alive about this case after today, that they could use operation of the plant as evidence of copying? I don't agree because we announced this collaboration in January of 2016. They submitted their paper at the patent office several months later and never raised the plant as an argument for copying. Therefore, we submit it was waived. So there was a public announcement about the joint collaboration. It was a press release, January 2016. It's in the record before your honors. Several months later, they filed their paper, substantive paper, arguing copying. They made no allegation that the pilot plant work, this collaboration, was part of a copy. What do we do with, from your standpoint, the fact findings of the board that the evidence fails to show it would have been obvious to adjust both the temperature and the oxygen pressure to be within the claimed ranges as a matter of routine? Of course, that was the routine optimization theory. Really, the focus of our appeal is on an alternative theory, which was presented, and that is for overlapping ranges. Again, if you look at the chart on page 2 of our reply, there is no difference between claim 1 and RU-177 if you properly interpret the claim to include its specified lower endpoint. Your whole discussion about presumptions seems to be somewhat of a straw man here. Even if there is a burden shifting, the burden is only one of production, correct? Correct. There's no doubt that the patent owner produced evidence of unexpected results. Whether it was ultimately sufficient or not doesn't change the fact that there was production of evidence of unexpected results. That whole issue of presumption seems to fall off the table. Well, Your Honor, in the board's analysis, they did not even consider this overlapping ranges argument on the merits because in the board's view, the Magum oil case precluded it from even considering the argument. That's our point. That's not what they said. That's not what they said. What the board said is that to the extent that you're saying that the burden of persuasion shifts, it doesn't. There was no issue with respect to production because production occurred. It was already in the record. They never applied Peterson. They never applied Ormco. Again, even just taking claim 1 as an example, we think that is a representative claim. If you look at the board's findings on page 9 of its decision, it found that every single element of claim 1 is present. The only argument patent owner made to try to distinguish that claim was this purported exclusion of 140 from claim 1. Therefore, our position is that if you look at claim 1 and actually accept the board's findings as to RU-177, you can check off every single element. They are all there according to the board's own findings. You're not here complaining about the failure to institute as to RU-177. You didn't file anything. You waived any SAS argument, right? Your Honor, according to the board's decision, the RU-177 argument was essentially full of the grounds that were instituted. It said that in the institution decision. We cited that in our brief. For example, at page 2107 of the joint appendix, the board said that the instituted grounds fully encompass the relevant teachings of RU-177 cited for the challenge, which was ground 4 that was not instituted. The board did consider RU-177. They were supposed to consider RU-177 alone as to claim 1, and that was ground 4. Even though it wasn't instituted, it was effectively folded into what was considered. Our point on claim construction is that this was the only argument that patent owner raised to try to distinguish RU-177 from claim 1. It's incorrect as a matter of law because under the broadest reasonable interpretation, that specified lower end point should be part of the claimed range. For example, the specified... You never argued any of the abutting ranges case law that we have. Why is that? We did argue... There were two theories presented below. There was a Peterson type argument for overlap, and there was a titanium metals argument that was also made. In other words, if the claim here, even if it abutted and was viewed as being very close but not actually overlapping, under titanium metals, that would still establish prima facie obviousness or a presumption of obviousness. The fact is there is no evidence there's any difference in properties between what is described in RU-177 and the embodiment that that falls within claim 1. You're arguing that RU-177 should be considered as a standalone reference even though the board refused to institute on that? As to claim 1, yes, because that was part of what the board said would be considered in the instituted grounds. It specifically said that the teachings of RU-177 alone, that the instituted grounds on the combined art fully encompass the relevant teachings of RU-177. That's at 2107. It was part of the instituted grounds. Therefore, that's why for claim 1, you only need to look at RU-177. You just accept the findings that are there, and every single element of claim 1 is met. The only argument that's been raised was for the claim construction. You never argued a section 102, right? No, it wasn't argued as anticipation. It was argued as obviousness under this well-established case law for overlapping ranges, which we submit applies here as to claim 1. Why do you believe that their evidence as to unexpected results or criticality was insufficient? The board made findings. There's very little data in the patent. The board's findings were a little weird. What they basically said was that evidence was not as persuasive as the other evidence that they found against you. Just as one example, Your Honor, the claim purports to claim a range of 1-10 bar of partial pressure for oxygen. The patent for the HMF examples only tested one partial pressure, 4.2, which was 20 bar. The additional data they submitted from Dr. Grutter, same thing, 4.2. They submitted no other data to show this range of 1-10 means anything from a scientific standpoint. It appears to be it's a range. It's a range of numbers, but the point that one of that was one of the board's points. It was pretty amazing that the results were so different, right? They're not so different. If you look at the data in the patents, I believe it's about something like 15 out of 21 of these so-called inventive examples are less than 70%, which is what Partenheimer predicted. Most of the results are quite low. Look at Experiment 3F in Table 3, which is within Claim 1. It's with DMF as a starting material, 7% yield. They don't disagree that that's within the scope of Claim 1. Claim 1 doesn't require any specific yield. It covers 7%. It covers 1%. It covers 0.1%. No specific ratios of catalyst concentration. No reaction time. It could be any amount of reaction time. This claim is so broad on its face that it touches, it sweeps in this RU177 embodiment, which uses the same starting material. It's the same air oxidant, same catalyst, same acetic acid solvent, makes the same product, same oxygen partial pressure. If we agree with you that RU177 does encompass both of those data points, wouldn't it be more appropriate to remand for the board to reconsider the objective indicia, given the fact that the board, A, really didn't need to consider it since it said it already had no evidence of obviousness, and B, because it was very dismissive in the way it treated it? Your Honor, remand is a possibility here. We don't disagree with that. We submit that as in Holman Housewares, there was no remand. It simply reversed because there was a failure to follow the law, and I think this is similar. This intrinsic evidence shows that the claim range should include 140, and that was the only argued difference, and that's an issue of law. Also, for claims 3, 4... You're saying especially under BRI. Exactly. Especially under BRI, and that's a key factor here. Judge O'Malley's question, though, is about balancing whatever you see as the reasons for doing the optimization against the secondary consideration evidence, and perhaps the board didn't really seriously consider that evidence in the first go-around that maybe it ought to on a remand. Could you answer that question? No, I think it's a fair question. I think there is a certain amount of balancing here. Our position was that the board ultimately looked at it very carefully, and looked at the data, and saw a number of reasons. For example, it wasn't commensurate in scope. What they offered was not commensurate in scope with the claims. There were a number of reasons for the lack of unexpected results, and Sinvina hasn't even argued a lack of substantial evidence for those findings on appeal. The other claims that we think shouldn't necessarily be remanded, claims 3, 4, 7, 8, 9. There were no separate arguments for patentability for those claims over claim 1. 3 and 4 are the same, like zirconium. What about the catalyst? The catalyst is identically described in RU177 for claim 1. Claims 3 and 4 basically say you can add this additional metal to the catalyst. Sinvina has never argued that that was not an obvious thing to do, based on other references such as 732, which said you can optionally add this extra metal. They've never argued that claims 3 and 4 are separately patentable. They've never argued that claims 7, 8, 9 are separately patentable. Those are the claims that simply require making an ester from the FDCA product. Mr. Flibert, you're well into your rebuttal time. Why don't we hear from your opponent, and we'll give you three minutes of rebuttal time. Thank you, Your Honor. Mr. Richter. Good morning, Your Honors, and may it please the Court. I'm Paul Richter. I'm here for the first time, and I'm happy to be here to discuss the very exciting technology. As opposing counsel mentioned, it's green chemistry, FDCA. It's completely bio-based. It starts with HMF, which is derived from sugars. They've built a plant now, so is there standing? No, I don't believe so, Your Honor. Because? Because I don't believe they've carried their burden of demonstrating standing, which is entirely their burden. They did mention that they've opened the plant, and they're running it. You may have seen the correspondence, I'm sure, in the record between myself and opposing counsel with regard to what was going on in that plant. We gave them the opportunity to tell us. The way they've described the process that's being performed by the plant, it seems to have essentially all the features that are claimed here. So therefore, there'd be a risk of infringement. Well, I respectively disagree in terms of the record before the Court, Your Honor. They described the process as being designed to operate in operating parameters which are broader than the temperature and pressure parameters in Claim 1, for example, which are between 140 and 200 degrees C, and 1 to 10 bar. I believe in their declarations, they put three of them in, but all they said was that they were designed to operate between 125 and 250 degrees C, and 0.02 to 100 bar, preferably 0.2 to 21 bar. So I contend that there are other processes for making FDCA. Didn't you decline to grant a covenant not to sue? That's right, Your Honor. Absolutely, we did. Isn't that tantamount to an accusation of infringement? Well, I don't agree, Your Honor, respectfully, because we don't know what they're doing yet. So from the standpoint of their burden of satisfying standing, my contention is that they had the obligation to inform the Court about what they were doing and why that put them at risk. Well, and they had to have standing as of the filing of this appeal, right? That's correct, Your Honor. Not as of today. Correct. I don't believe they can walk into court today and establish standing. So I don't believe they had standing at that time, and I don't believe they demonstrated it with their declarations. That doesn't mean that they, as we wrote in our brief, it could be that they will infringe our patent. And that would be our burden to establish that. And we would go to them and say, what process exactly are you running? And if we determined that it was our process, there could be an infringement suit. And you'd argue that they were stopped. Stopped from what, Your Honor? From attacking your patent. Right? If they have no standing, and if we ultimately agree that the Board got it right, then any They wouldn't be able to argue non-infringement, but they wouldn't be able to attack the patent at that point, right? Well, certainly the provisions of estoppel that flow from a positive result for my client in this case would apply, absolutely. But in our view, they had their opportunity to try to establish standing, and they didn't do it. Let's talk about the patentability of the process. Sure. Isn't it sort of basic chemical process technique that when you've got a couple of key variables in a process, there's this motivation to modify them to improve the yield of the process, save money? Well, Your Honor, those are two things that were Isn't that what was done here? I disagree respectfully, Your Honor. In fact, that's the crux of the Board's decision, where it found fully supported by significant substantial evidence that there was not that motivation. Because in fact, that was the position of the petitioners, is that there would have been a motivation to optimize the 732 publications process. Because remember, notwithstanding that, in our view, they are trying to appeal a ground that never occurred during the IPR, because there was never a ground that said all elements are disclosed in the Russian reference. We'll get to the claim construction on 140 degrees in a second. But just getting to the 732, the 732 has an overlapping temperature range. So I don't see why, at least initially, they need to go any further on the temperature range, unless you can show unexpected results for your claimed temperature range. It really boils down more to the pressure question, which is, would one of skill in art have appreciated that fiddling with pressure in this sort of reaction would affect results? And I think that's, then when we see references using a lot of different pressure values, that seems to suggest that there is evidence in the record that pressure, not surprisingly, affects results for chemical reactions, just like temperature does. So why isn't it true in that sense that any chemist in trying to produce this FDCA acid would know that if you fiddle with temperature and pressure and maybe reaction time and things like this, these are classic parameters that affect results? Certainly, Your Honor. And the board did a very thorough job examining exactly the questions that you just posed. There was substantial evidence submitted from both sides on those issues. And you have to look at the art as a whole. So if you look at the 732 publication... Well, that's what I'm doing here. When I'm looking at the references and I see the references calling out different pressure values here and there, why isn't that evidence, pretty real confirming evidence, that yes, when you change pressure, you're going to impact results, or there's a strong likelihood of that? After all, the pressure is of oxygen, which is one of the reactants. So affecting the pressure of one of the reactants would obviously affect the results. Well, starting with pressure, that's a good question, Your Honor. So there's two main elements that were discovered by my clients in Vena with respect to optimizing and improving yield. And so there were very dramatic improvements. In fact, Partenheimer, one of the background prior art, predicted you could never get above 70 percent yield for FDCA. We blew through that number with our modifications. Now, starting... I'd like to start with temperature, if I may, because that's the 732 publication. If you look at that, they never oxidize above 125 degrees. When you look at the examples... It discloses a temperature... 732 discloses a temperature range that completely encompasses your claimed temperature range. I'm more interested in pressure. Okay, so then I'll start with pressure. So if you look at pressure, there's two pressures. The total pressure, which is the total pressure of the reaction, and the oxygen partial pressure. They're not the same. The oxygen partial pressure is obviously the reactant. And so our oxygen partial pressure of 1 to 10 bar is lower than the 732, significantly. Almost 33 percent lower, because they're at 14 and a half bar. The board found that a person of ordinary skill in the art would imagine... 732 did disclose having a pressure such that you maintain the acidic acid solvent in liquid phase, right? Correct. And so liquid phase, it encompasses 14.5 bar, which is the example they disclosed. But it also encompasses 1 to 10 bar, which is your claimed pressure range. Is that right? No, it does not, Your Honor. It doesn't? It does not, because as the board noted and made detailed findings, in fact, the 732 in keeping the solvent in the liquid phase, or mostly in the liquid phase, is talking about the total pressure, which does not necessarily mean that the oxygen partial pressure will be within the 1 to 10 bar of our claim 1. Even assuming that that's the case, I mean, this whole results effective variable discussion by the board seemed a little confusing, given the fact that I thought your whole point with respect to unexpected results is that they are results effective variables, and by finding that narrow range, you actually got a totally different result. Well, there's two things. We did that against the wind of the unpredictability of those results effective variables. So turning to temperature, in the 732 publication, if you compare examples 20 and 25 and 19 and 24 and 17 and 35, for example, there you have a pressure increase where the yield either stays the same or goes down. And even though they were oxidizing at higher temperatures, 125, the highest yield they got was at 105 degrees, and that was only 58%, which was much lower than the results that we got. So the board found that there was an unpredictability in the effective temperature, and that there was also an unpredictability in the effective reaction time, as shown by the examples in the 732 publication. Well, but if that's the case, then why didn't the board agree that these were unexpected results? Well, I think, as you noted, Your Honor, the board, in evaluating the secondary considerations, they didn't reject our evidence. The board said that it was less probative than the case for the claims not being obvious due to the unpredictability and the lack of the motivation to combine. And I think that's really the central focus of the board's decision. I thought it identified a couple problems. One, Mr. Flibert identified, which is the commensurate in scope with the claim concern that your examples, your experiments were limited to just using 4.2 bar and didn't really go across the scope or any attempt to go across the scope of the range of 1 to 10 bar. At least with the experiments on the temperature range, you had a few different examples of different temperature you used. The second problem was that it didn't look like there was an apple-to-apple comparison in the sense that you didn't explain how you kept all the variables constant while you were doing your different experiments, thereby raising the concern that you didn't really exactly show why it was that this particular shift in temperature and this particular shift in pressure were the reasons for the extra high yield rate. So what is your response to those two concerns the board raised? My response is the board did make those observations, but it did not out of hand reject the unexpectedly improved results. It just found them to be less probative or less persuasive. My second response would be that notwithstanding those observations of the board, there is nobody that I'm aware of anywhere, certainly not in the prior arc, that has ever achieved the high yields of FDCA that Synvena has achieved operating the process of Claim 1. But it would seem then that the board's findings, even though the board said they went to motivation to combine, are really more relevant, even their factual findings as to the results effective variable issue, would seem to be more relevant to the question of whether it was truly unexpected. In other words, the problem is that by characterizing it as saying there's a lack of motivation to combine versus characterizing it as the fact that no one really thought or understood that these could produce a difference when narrowed to such an extent, that the board actually confused the whole analysis. I don't think the board confused the analysis, Your Honor. I think it's really relevant to both. I mean, naturally, when you submit evidence of unexpected results, that's squarely in the midst of a secondary consideration analysis. But at the same time, you have to look at the prior arc as a whole. And especially when you have a chemical optimization allegation or assertion by the petitioners, you have to say, well, why would somebody optimize the process? Or why wouldn't they? What would be the motivations of a person of ordinary skill in the art? There's always a motivation to optimize a process to save money. And I hear mention of result-oriented variable. Isn't every variable in a chemical process reaction result-oriented? Why else would it have been there? You don't put limitations in a claim that don't affect the result. That's what claim drafting involves. Absolutely, Your Honor. It is result-oriented. But the point with the motivation to combine is that the results. You're not combining things. The temperature and the oxygen pressure are part of the process. They're there. We're not taking. It's not like combining two items to make a product. This is a process with variables that are in the process. It's not a question of combining. It's a question of varying. You're right, Your Honor. And that was the ground that was instituted, varying the process of 732 publication based on RU177 and the 318 publication and cost considerations, as you point out. And the board looked at the cost considerations analysis and said, in fact, that a person would not be motivated to lower the pressure for cost considerations, which their expert contended through patents related to xylene oxidation, but then admitted. If you lower the pressure, you lessen the use of oxygen, right? And that must cost money. Correct, Your Honor. But that's a reactant, and you wouldn't expect that by reducing the reactant you could increase the yield. You would expect the opposite. So even if that was a cost consideration, it's offset by the fact that you wouldn't expect that you could produce as much FDCA in that regard, and the board found that. And finally, I didn't have a chance to talk about the 318 publication, but the board made detailed findings that notwithstanding the pressure and temperature there, there's no motivation because of the catalyst used. It's a fixed bed reactor. You have to keep the HMF in solution. But is the catalyst relevant to claim one? Absolutely, because they don't use the same catalyst as 318. They use a platinum-based catalyst, which is a heterogeneous catalyst. You would agree this involves really close prior art. Is it close prior art? This patent is faced with a lot of close prior art. Well, there's certainly prior art there, Your Honor, that involves oxidizing HMF. It's not close in the sense that- Let me ask it differently. Sure. If between 140 degrees to 200 degrees includes 140 degrees Celsius, then does RU-177 have every element of this claim? Of claim one? Yeah. That's their contention, Your Honor, yes. I'm asking you, though, because all I saw from your briefing was RU-177 lacks the temperature range because the highest point of temperature in RU-177 is 140 degrees Celsius. Correct. And your claimed temperature range doesn't begin until 141 degrees Celsius because you read between 140 degrees to 200 degrees as excluding 140 degrees. That's right. So if I were to read the claim between 140 to 200 as actually including 140 degrees, then the disclosed range in RU-177 would abut and, therefore, overlap with the claimed range. Doesn't that mean that RU-177 has all the elements of the claim? Well, it would abut the range. And if you include 140 in our claim, RU-177 does say 115 to 140. We are operating under BRI. Yes, Your Honor. Can you just answer the question? Is the answer yes or is the answer no? The answer would be yes. It has all those limitations. But let me say this, Your Honor. I need to add abut in the sense that that was never litigated below. So we never had any expert testimony. We never had any argument about that because that's not a ground that was instituted by the board. And, in fact, there's a reason for that that I think is significant. Page 2057 of the index, A2057, is their petition where they say RU-177 does not overlap with the temperature range. They admit that. So, up front, the board had that in front of them. I guess, at least at a minimum, I'm trying to underscore Judge Lori's question to you, which is, isn't the prior art here pretty close to the claimed invention? There are individual pieces of the prior art that have individual ranges of temperature or pressure that are close to the invention. But when you look at what the invention is as a whole, the specific temperature range, the specific pressure range, there's nothing in the prior art. There's nothing in cost considerations that they advocated that would lead a person to precisely develop the particular ranges that we have. And that's the unexpected results. But it's also motivation to alter. There's no motivation to alter. Their argument is that you look at 732, and a person would have been motivated through ordinary engineering skill to adjust the pressure and temperature in ways that would result in our invention. And the board said, no, that's not true. Because I look at the teaching of those references. Thank you, counsel. You've exceeded your time. And we will give Mr. Flibert five minutes to balance it off. Could I just add one thing quickly, Your Honor? Claim 2 recites only HMF or HMF esters as the starting material, so that's outside of RU-177. Thank you, counsel. Okay. Thank you, Your Honor. Thank you, Your Honor. They chose to write Claim 1 to include 5MF as one of their optional starting components. And there is no difference between Claim 1 properly construed and RU-177. What do you do with the fact that you actually said RU-177 does not overlap with the range? Your Honor, as I think I had mentioned, there were two theories presented. I mean, this seems to be something that you newly discovered on appeal. No, absolutely not. If you look at page 2258, this is, I think, a fair place where it's characterized. It was argued that RU-177 discloses oxidation reactions at temperatures of 115 to 140, which overlaps or at least abuts the claimed range. So there were two arguments presented below. There was an overlapping ranges argument, and there was a titanium metals type argument. The overlapping ranges argument is when it overlaps, and that's where, such as in Peterson, then there's a presumption of obviousness that applies. But to be fair, wasn't there a part in your IPR petition for the ground based on RU-177 alone where the petition actually says we acknowledge that it doesn't disclose every limitation, but nevertheless the temperature range is super close to the claimed temperature range? You know, maybe it wasn't perfectly clear, but in that same paper they argued. It says something like that, right? So then if you look at the next paper, Your Honor, we continue to argue that the claim should be interpreted to include its end point of 140, and we continue to press, particularly in the reply, which the board quotes in the section when it's talking about magnum oil, in the reply we did press this overlapping ranges argument. And so our position is if you look at the results. How do you deal with the fact that the petition itself says they don't overlap, and then you say in your reply they do? I mean, the board doesn't have to give credit to what you said in the reply if it's inconsistent with what you said in your petition, right? Well, the board instituted on the grounds that it instituted. It didn't institute on the ground floor with RU-177 alone, but it did fold it into the grounds that were instituted. And we did in response to that in our reply make arguments about overlapping ranges, and we did specifically argue that that itself was enough to create a prime official case. There was a separate section in the petition that asked for this claim construction, right? Exactly. For the range to include the end point 140 degrees Celsius. Exactly. It was specifically requested. The results here, if we want to look at the substance of this, and again, the RU is incredibly close, and there's no meaningful difference. If you look at the patents examples 3A and 3B, those concern the 5MF starting material, which is the same one that's in RU-177. The patent reports results of around 40%, plus or minus a little. That's essentially the same results in RU-177, which reported 36% yield. What did it do with the fact that the board made multiple, multiple findings of fact? I mean, there were detailed findings of fact here about what one in the art would have understood at the time. We can't just ignore all those findings of fact. That's correct. And that's really under the root, under the optimization theory. That was a separate theory, and the board's analysis there is what it is. We do think there were infirmities in that analysis when the board was requiring DuPont and ADM to show express teachings of, for example, cost-saving motivations. We don't think that's required under KSR. We think that was legal error. But again, my primary focus today has been to point out the lack of any meaningful difference between Claim 1 and RU-177, as every single element of that claim. And the only argued difference, and you didn't hear anything different from Council, was the temperature range. And properly construed under broadest reasonable construction, it includes 140, and therefore all the elements are there. And under Peterson, that claim should be presumed obvious. And given the current findings of no unexpected results, and the board did find, we find that... Even if that's the case, it's not a substantive presumption in terms of evidentiary value. It's just a question of whether that then shifts the burden to show unexpected results, which would seem to be supported by, frankly, the findings the board did make, that no one would have had the desire to optimize. I mean, they did, but they ultimately found that PatentOwner has not established unexpected results or criticality for the claimed range. That was the board's finding. That is supported by substantial evidence in the board's analysis. So as it stands, they did consider all the factors, and that's why we think this was harmful error for failing to construe the claim to include 140. If they had construed it that way, and they had applied, they should have applied Peterson, and they should have concluded, based on the lack of unexpected results, that these claims are unpatented. Did you ask them to construe the claim during the hearing? Your Honor, I don't recall whether that came up at the hearing. I think it's pretty clear it didn't, right? Well, it had been requested during the briefing at both stages. Thank you, counsel. Thank you, Your Honor. We will take the case on revise. Thank you.